**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 17-cv-01334-RM-NYW

CAN D. GIDDING, an individual

      Petitioner,

v.

TIMOTHY W. FITZ, an individual,
KELLY E. FITZ, an individual,

      Respondents and Counter-Movants,

v.

CAN D. GIDDING, a/k/a CAN DANNY GIDDING a/k/a JOHN GIDDING,
GIDDING & SPENCER,
FOUR YEAR GAP, LLC,
MIDSHORE MARKETING, INC., and
JANUS ARCH,

      Counter-Respondents,

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

Magistrate Judge Nina Y. Wang

      This matter comes before the court on the "Motion of Respondents and Counter-Movants Timothy Fitz and Kelly Fitz to Confirm Arbitration Award," ("Motion to Confirm"), [#21, filed August 2, 2017]. The Motion to Confirm is before the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), Fed. R. Civ. P. 72(a) and (b), the Order Referring Case dated June 2, 2017 [#4], and the memorandum dated August 3, 2017 [#27]. After carefully reviewing the Motion to Confirm and related briefing, the entire case file, and the applicable case law, this

court **RECOMMENDS** that the Motion to Confirm be **GRANTED IN PART and DENIED IN PART**.

## BACKGROUND

Petitioner Can D. Gidding ("Petitioner" or "Mr. Gidding") initiated this civil action on May 25, 2017 by filing *pro se* a Petition To Vacate Arbitral Award (the "Petition") as to Timothy Fitz and Kelly Fitz (collectively, "the Fitzes" or "Respondents"). [#1]. On August 2, 2017, the Fitzes filed an Answer to the Petition, [#20], along with the pending Motion to Confirm, asking the court to confirm the arbitration award. [#21]. The following facts are drawn from the record before the court, including the Petition, the Fitzes' Answer, [#20], the Motion to Confirm Arbitration Award, [#21], and from the language of the Interim Arbitration Award ("Interim Award"), [#21-1], and Final Arbitration Award ("Final Award") [#21-2].

Underlying Agreement

Beginning in 2003, Mr. Gidding "portrayed a designer on television," specifically, the Home and Garden TV Network ("HGTV"), [#1 at ¶ 6; #21 at 2], and he acted with the help of his father, John R. Gidding, also known as Janus Arch. [#1 at ¶ 6].[1] In 2008, John R. Gidding established John Gidding Design Inc. ("JGDI"), "to shelter and promote the talents of his children." [*Id.* at ¶ 7]. The following year, an individual unrelated to these proceedings established Midshore Marketing Inc. d/b/a JanusArch ("Midshore") to manufacture furniture designed by JGDI. [*Id.* at ¶ 8]. In 2011, Midshore employed John R. Gidding and Krystee M. Spencer, among others, "to develop a new market for home renovation using JGDI's designs." [*Id.* at ¶ 9]. Ms. Spencer was elected as chief executive officer for Midshore and Midshore moved its headquarters from California to Georgia. [*Id.*]

---

[1] Hereafter, the court uses the designation "Mr. Gidding" to refer to Petitioner, as distinguished from John R. Gidding, which is used to reference Mr. Gidding's father.

In 2013, the Fitzes purchased a residence located on Dahlia Street in Denver, Colorado (the "Dahlia Street property"). They subsequently engaged Midshore to design the interior space of the residence. [*Id.* at ¶ 10]. On October 31, 2013, the Fitzes entered into an agreement with Midshore for the complete remodel of the Dahlia Street property ("the Agreement"). [#1, ¶¶ 5, 10, 11]. Mr. Gidding asserts that John R. Gidding and Ms. Spencer negotiated the Agreement with the Fitzes. [*Id.* at ¶¶ 6, 9, and 11].

On November 21, 2013, Ms. Spencer established Four Year Gap, LLC ("FYG"), to assist with Midshore's renovation business "as Midshore planned to phase out home renovation and return to the manufacture of furniture by the end of 2014." [#1 at ¶ 12; #21 at 2]. In February 2014, FYG offered the Fitzes the option of remaining in the Agreement and allowing FYG to manage the project, or terminating the Agreement and signing a new contract with FYG. [#1 at ¶ 13]. The Fitzes elected to remain in the Agreement, permitting FYG to manage the project. [*Id.* at ¶ 13-14]. On October 10, 2014, the Fitzes entered into a contract for construction on the Dahlia Street property, and the contract identified "Gidding & Spencer" as a professional partnership and the Fitzes' architect. [*Id.* at ¶ 15].

By all accounts, the renovation of the Dahlia Street property went poorly. [#21-1 at 2]. In February 2015, legal counsel for the Fitzes approached Ms. Spencer to sign a contract "that retroactively extended the liability of 'Gidding and Spencer, a general partnership,' to December 22, 2014." [*Id.* at ¶ 17]. Ms. Spencer refused to sign, and, in April 2015, the Fitzes terminated the Agreement and stopped payments. [*Id.* at ¶¶ 17-18].

<u>The Arbitration</u>

On May 8, 2015, based on the terms of the Agreement, Midshore commenced arbitration against Mr. Fitz through the American Arbitration Association ("AAA"), seeking to recover

amounts claimed to be due under the Agreement.  [#1 at ¶ 19; #20 at 4].  Mr. Fitz served an answer and asserted counterclaims and, on July 7, 2015, moved to join the following as counter-respondents: "Can D. Gidding a/k/a Can Danny Gidding a/k/a John Gidding; Krystee Manifold a/k/a Krystee Manifold Spencer a/k/a Krystee Spencer; Janus Arch; and Gidding & Spencer." [#1 at ¶ 21; #20 at 5].  On July 19, 2015, FYG joined in the arbitration.  [#20 at 6].  On September 16, 2015, through a Rule 7 joinder process, Mr. Fitz's motion to join was granted.[2] [#21-1 at 5].  In granting the motion to join, Donald Betram (the arbitrator appointed under Rule 7 to adjudicate the issue of joinder) concluded that Mr. Gidding and Ms. Spencer were operating as a partnership and that each was therefore bound by the Agreement, including the arbitration provision.  [#20 at 6].  Midshore subsequently moved to join Mrs. Fitz, and the Fitzes consented to the joinder.  [*Id.* at 7].

On May 5, 2016, Daniel Gross (the merits arbitrator) held a preliminary hearing at which he set a multi-day evidentiary hearing to begin February 13, 2017.  [#21-1 at 5].  On June 17, 2016, Ms. Spencer filed for bankruptcy individually; the arbitration was stayed as to her and she was ultimately dismissed as a party.  [#20 at 8; #21-1 at 5].  On August 12, 2016, the Fitzes filed and served amended counterclaims, which asserted as follows: breach of contract; violation of the Colorado Trust Fund Statute, § 38-22-127, C.R.S.; breach of fiduciary duty; violation of the Colorado Civil Theft Statute, § 18-4-405, C.R.S.; conversion; an accounting of the funds disbursed to counter-respondents; negligent design; negligent misrepresentation; promissory fraud; and to pierce the veil of the alleged entities Midshore, Janus Arch, FYG, and Gidding &

---

[2]  The AAA Construction Industry Arbitration Rules and Mediation Procedures, effective July 1, 2015, may be found at https://www.adr.org/sites/default/files/Construction%20Rules.pdf (last visited Jan. 16, 2018).

Spencer.  [*Id.*]  Midshore ultimately abandoned its claims against the Fitzes, and the arbitration went forward as to the Fitzes' counterclaims only.[3]

On February 10, 2017, three days prior to the evidentiary hearing set by the arbitrator, Mr. Gidding emailed the parties to the arbitration and the arbitrator advising that, "[b]ecause I am not, nor have I ever been, a signatory to the agreement to arbitrate any dispute with Timothy or Kelly Fitz, I reject the jurisdiction and authority of this Arbitrational Court…[and] I reserve all of my rights, positions, and defenses."  [#21-1 at 6].  On February 13, 2017, the evidentiary hearing went forward as planned; the Fitzes were the only parties in attendance and the only parties to put forth evidence. None of the counter-respondents appeared and none sought to testify by remote means.  [#20 at 9].  On March 2, 2017, the arbitrator issued the Interim Award, which awarded $670,192 in damages to the Fitzes and directed them to submit evidence of prejudgment interest, costs, and attorneys' fees.  On March 22, 2017, the arbitrator entered the Final Award for the amount of $819,926.66 "in favor of Timothy and Kelly Fitz and against Midshore Marketing, Inc., Janus Arch, Four Year Gap, LLC, Can D. Gidding a/k/a John Gidding, and Gidding & Spencer, a general partnership, jointly and severally."  [#1 at ¶ 33; #1-12].

<u>Current Proceedings</u>

On May 25, 2017, Mr. Gidding filed the Petition seeking to vacate the Final Award on account of fraud, that he was not a signatory to the Agreement, that the AAA tribunal did not obtain personal jurisdiction over him, that his procedural due process rights were violated, and pursuant to the equitable doctrine of unclean hands.  *See* [#1].  On July 13, 2017, the undersigned presided over a Status Conference at which the Parties represented they required no discovery,

---

[3] Throughout part of the arbitration, Midshore was represented by legal counsel.  Its counsel ultimately withdrew prior to the evidentiary hearing.  *See* [#21-1 at 3].  Thereafter, only the Fitzes were represented by counsel.

and discussion was held regarding the anticipated briefing schedule for the anticipated Motion to Confirm. *See* [#15]. On August 2, 2017, the Fitzes filed their Answer to the Petition and the pending Motion to Confirm, and the affidavits of two attorneys and of Mr. Fitz in support thereof. [#20; #21; #23; #24; #25]. The same day, the Fitzes filed an opposed motion to join asking the court to join as counter-respondents to the Motion to Confirm the entities that were party to the arbitration, i.e., Gidding & Spencer, FYG, Midshore, and Janus Arch (the "Other Parties"), for the purpose of asking the court to confirm the Final Award as to them. On November 6, 2017, this court granted the motion to join, [#49], and the Clerk of the Court issued the appropriate Summons. The returns of service as to the Other Parties were filed on December 22, 2017, reflecting service on December 1, 2017 [#54, #55, #56, #57], but none of the Other Parties has entered an appearance in this action.

On December 28, 2017, the Fitzes filed a Motion for Entry of Default pursuant to Federal Rule of Civil Procedure 55(a) as to "Midshore Marketing, Inc.; Midshore Marketing, Inc. d/b/a Janus Arch; Four Year Gap, LLC; and Four Year Gap, LLC d/b/a Gidding & Spencer," on the basis that these entities "failed to plead or otherwise defend in response to the Fitzes' Motion to Confirm Arbitration Award." [#58 at 1-2]. Accordingly, this Recommendation pertains to Mr. Gidding only, given the non-appearance of the Other Parties. The court exercises jurisdiction over this action pursuant to 28 U.S.C. § 1332.

## ANALYSIS

### I. Applicable Law

The Parties agree that the Federal Arbitration Act, 9 U.S.C. § 9 ("FAA") governs the issues raised herein. *See, e.g.*, *Comanche Indian Tribe of Okla. v. 49, L.L.C.*, 391 F.3d 1129, 1131 (10th Cir. 2004) (stating that the FAA "applies to all arbitration agreements 'involving

commerce,' and 'create[s] a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act.'" (alteration in original) (quoting 9 U.S.C. § 2; *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)); *see also id.* at 1132 ("The requirement that the underlying transaction involve commerce 'is to be broadly construed so as to be coextensive with congressional power to regulate under the Commerce Clause.'" (quoting *Foster v. C.F. Turley, Jr.*, 808 F.2d 38, 40 (10th Cir. 1986)).

Section 9 provides that "[i]f the parties in their agreement" to arbitrate:

> have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, ... then at any time within one year after the award is made any party to the arbitration may apply to the court ... for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title.

9 U.S.C. § 9. Section 10 permits the court "in and for the district wherein the award was made" to vacate the arbitration award upon the application of any party to the arbitration, under the following circumstances:

> (1) where the award was procured by corruption, fraud, or undue means;
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

*Id.* at § 10.

"Once a dispute is properly before an arbitrator, the function of the courts in reviewing the arbitrator's decision is quite limited." *Denver & Rio Grande Western Railroad Co. v. Union Pacific Railroad Co.*, 119 F.3d 847, 849 (10th Cir. 1997) (citation omitted). And, "[o]nce an arbitration award is entered, the finality that courts should afford the arbitration process weighs

heavily in favor of the award, and courts must exercise great caution when asked to set aside an award." *Foster v. Turley*, 808 F.2d 38, 42 (10th Cir. 1986) (citation omitted). "A court may only vacate an arbitration award for reasons enumerated in the Federal Arbitration Act, 9 U.S.C. § 10, or for a handful of judicially created reasons." *Denver & Rio Grande Western Railroad*, 119 F.3d at 849 (citations omitted). *See Sheldon v. Vermonty*, 269 F.3d 1202, 1206 (10th Cir. 2001) (listing the judicially created reasons as "violations of public policy, manifest disregard of the law, and denial of a fundamentally fair hearing"); *ARW Exploration Corp. v. Aguirre,* 45 F.3d 1455, 1463 (10th Cir. 1995) (acknowledging a judicially-created basis for vacating an award when the arbitrators acted in "manifest disregard" of the law, which requires a finding that the decision exhibits "willful inattentiveness to the governing law."). So as to "protect the finality of arbitration decisions, courts must be slow to vacate an arbitral award on the ground of fraud." *Foster*, 808 F.2d at 42 (citation omitted). The party claiming fraud must establish the fraud "by clear and convincing evidence," and "must show that due diligence could not have resulted in discovery of the fraud prior to arbitration." *Id.* (citations omitted). "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *Advisor Dealer Services, Inc. v. Icon Adviser's, Inc.*, 557 F. App'x 714, 717 (10th Cir. 2014) (quoting *Int'l Bhd. of Elec. Workers, Local Union No. 611, AFL–CIO v. Pub. Serv. Co. of N.M.,* 980 F.2d 616, 618 (10th Cir. 1992)) (further citation omitted).

The Parties also assert that the Colorado Revised Uniform Arbitration Act, ("CRUAA"), Colo. Rev. Stat. § 13-22-222 *et seq.* applies, to different ends.[4] However, "[i]f the [Federal] Arbitration Act is applicable, federal law governs the enforcement of and challenges to an

---

[4] Mr. Gidding argues that the CRUAA provides him additional grounds to vacate the arbitral award. [#1 at ¶¶ 37-39]. The Fitzes contend that the CRUAA gives this court a basis to award attorneys' fees and costs for this action. [#21 at 6].

arbitration award, even in diversity cases." *Foster v. Turley*, 808 F.2d 38, 40 (10th Cir. 1986). Indeed, courts in this District have held that parties to an arbitration agreement must agree that Colorado law govern an action otherwise controlled by the FAA, or the CRUAA does not apply. *See Pyle v. Securities U.S.A., Inc.*, 758 F. Supp. 638, 639 (D. Colo. 1991) ("[b]ecause there has been no showing that the parties agreed that Colorado arbitration law should govern in this FAA action, Colo. Rev. Stat. § 13–21–102(5) does not apply."); *Wolford v. Flint Trading, Inc.*, No. 13–cv–02835–WYD–CBS, 2014 WL 3747177, at *3 (D. Colo. Jul. 30, 2014) (same).

The Parties here do not represent that the Agreement provided for the CRUAA to apply, and the Agreement contains no such language. *See* [#1-2; #25-5; #25-13, #25-14]. *See also Lane v. Urgitus*, 145 P.3d 672, 684 n.1 (Colo. 2006) (Eid, J. dissenting) (noting in the dissent that § 13-22-203, the statute on which the Fitzes rely, simply allows parties to agree to apply an earlier version of the CRUAA: § 13-22-203 "specifies that the new statute will apply only to agreements to arbitrate made on or after August 4, 2004, unless the parties otherwise agree, on the record," and "[s]ince the parties do not agree that the arbitration statute applies at all, they clearly have not agreed to application of the 2004 Act."). In this case, the arbitration agreements only specified that any disputes would be settled by arbitration by the AAA under its Construction Industry Arbitration Rules, and "judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof." [#1-2 at 3; #1-3 at 3; #1-4 at 3; #1-5 at 3]. When initiating the arbitration, Midshore did not reference or invoke the CRUAA, *see* [#24-4], and neither arbitrator referred to the CRUAA in the Interim or Final Award, or the Order on the Rule 7 joinder. [#24-2, #21-1, #24-16]. Additionally, no Party cites any legal authority from either this District or the Tenth Circuit that suggests that the provisions of the FAA and CRUAA apply concurrently, or that parties to an arbitration agreement can

specify after the fact that the Acts should apply concurrently, and Plaintiff's reliance on *Byerly v. Kirpatrick Pettis Smith Polian, Inc.*, 996 P.2d 771 (2000) does not persuade this court otherwise. Accordingly, this court applies the FAA only.

## II.   Applicable Arbitration Rules

The Agreement specifies that any claim arising out of or relating to it, or any breach thereof, will be arbitrated by AAA pursuant to its Construction Industry Arbitration Rules (the "Rules"). No Party contests this provision. The Rules provide in particular relevant part as follows.

Rule 4 states that the party wishing to initiate arbitration shall file with the AAA the demand for arbitration, the fee, a copy of the arbitration agreement, and "shall simultaneously provide a copy of the demand and the applicable arbitration agreement to the opposing party ('the respondent')." American Arbitration Association, *Construction Industry Arbitration Rules and Mediation Procedures*, R-4(a) (July 1, 2015) *available at* https://www.adr.org/sites/default/files/Construction%20Rules.pdf.[5] The AAA then "provide[s] notice to the parties (or their representatives if so named) of the receipt of a demand when the administrative filing requirements have been satisfied." *Id.* at R-4(b). A respondent may then file an answer within fourteen calendar days after notice of the filing of the demand is sent by the AAA, and shall send a copy of the answer to the claimant and all other parties to the arbitration. *Id.* at R-4(c)(i). A respondent may also file a counterclaim within the same time period, and

---

[5] Through their legal counsel, Cecil Morris, the Fitzes attach a copy of the AAA Commercial Arbitration Rules and Mediation Procedures. *See* [#24-1]. However, the Agreement specifies that the Parties will apply the Construction Industry Arbitration Rules and Mediation Procedures. While the relevant sections of the two sets of rules do not appear to be different in material aspects, they are numbered differently.

shall simultaneously send a copy of the counterclaim to the claimant and all other parties to the arbitration. *Id.* at 4(c)(ii).

Rule 7 governs joinder of parties, and requires the appointment of an arbitrator for the limited purpose of determining the joinder issue; a merits arbitrator is thereafter appointed. *Construction Industry Arbitration Rules and Mediation Procedures* at R-7(a), *supra*. Where the party sought to be joined is not a party to an ongoing arbitration administered by the AAA, the party seeking joinder shall comply with the provisions of Rule 4(a) as to that party. *Id.* at R-7(c).

Rule 9 provides that the arbitrator "shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement" and "shall have the power to determine the existence or validity of a contract at which an arbitration clause forms a part." *Construction Industry Arbitration Rules and Mediation Procedures* at R-9(a)-(b), *supra*. "A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection." *Id.* at R-9(c).

## III. Application of Law and Rules

In the Petition, Mr. Gidding asserts multiple arguments in asking the court to vacate the Final Award. The court addresses first Mr. Gidding's assertion that he was improperly joined to the arbitration proceedings and that the Final Award was procured by fraud. [#1 at 10, 14, 17]. Mr. Gidding also argues that "the AAA tribunal did not obtain personal jurisdiction over [him]"; his procedural due process rights were violated in that he did not have an opportunity to participate in the selection of the arbitrator; and the equitable doctrine of unclean hands supports vacating the award. [*Id.* at 9, 13, 19].

In the Motion to Confirm, the Fitzes ask the court to confirm the Final Award, award additional prejudgment interest from the date of the Award until when judgment enters in this matter, and award attorney fees and costs pursuant to the CRUAA, Colo. Rev. Stat. § 13-22-225(3). *See* [#21]. Mr. Gidding argues in response that the arbitration award is "manifestly unreasonable" and that the arbitration did not guarantee "equality" between the parties. [#37 at 4]. There is no statutory basis under the FAA for vacating an arbitral award based either on "manifest unreasonableness" or because "the arbitration did not guarantee equality between the parties." *See* 9 U.S.C. § 10. But Mr. Gidding is proceeding *pro se*, and pursuant to a liberal construction of his papers, *see Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991), the court interprets this argument as a contention that the arbitrator exhibited manifest disregard of the law. [6] The court notes that Plaintiff's *pro se* status does not relieve him of the requirements of the substantive law, *Dodson v. Bd. of Cty. Comm'rs*, 878 F. Supp. 2d 1227, 1236 (D. Colo. 2012), nor does it permit this court to act as his advocate. *Yang v. Archuleta*, 525 F.3d 925, 927 n.1 (10th Cir. 2008).

## A. The Joinder of Mr. Gidding to the Arbitration

Mr. Gidding's arguments regarding the arbitrator's error in joining him to the proceedings and the basis for vacating the Arbitration Award on account of fraud are intertwined

---

[6] It is not entirely clear whether "manifest disregard of the law" remains a viable ground for vacating an arbitration award under the FAA because it is not specifically articulated in § 10. *Compare Abbott v. Law Office of Patrick J. Mulligan,* 440 F. App'x 612, 618 (10th Cir. 2011) (noting that "In the wake of *Hall Street* [*Assoc., LLC v. Mattel, Inc.*, 552 U.S. 576 (2008)], the circuits have split as to whether manifest disregard of the law is still a viable ground on which to overturn an arbitration award") *with THI of New Mexico at Vida Encantada, LLC v. Lovato,* 864 F.3d 1080, 1084 (10th Cir. 2017) (recognizing a "judicially created" basis of "manifest disregard of the law," on which to vacate an arbitration award). Because the Tenth Circuit continues to consider it a viable justification to vacate an arbitration award, I interpret Mr. Gidding's argument that the arbitration award was "manifestly unreasonable," as arguing "manifest disregard of the law," and consider it accordingly herein.

in the sense that the purported fraud involves allegations that Mr. Fitz and his legal counsel took action to misrepresent Mr. Gidding and Ms. Spencer, or cause them to misrepresent themselves, as General Partners of Gidding & Spencer. I address first, and together, the issue of the arbitrator's authority and Mr. Gidding's argument that joinder was improper because he was not a signatory to the Agreement. I address second Mr. Gidding's allegations of fraud. As described below, the Agreement delegated the issue of arbitrability to the arbitrator who acted within his authority in joining Mr. Gidding, and the record does not support a finding of fraud or manifest disregard of the law.

### 1. Authority of the Arbitrator and Application of Colorado Law

"[A]rbitration is a matter of contract," and the court cannot require a party "to submit to arbitration any dispute which he has not agreed so to submit." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002) (citation omitted). *Accord Rent–A–Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010) ("arbitration is a matter of contract," and courts must "place[ ] arbitration agreements on an equal footing with other contracts, and ... enforce them according to their terms.") (citation omitted). "Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, so the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about *that* matter." *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943 (1995) (emphasis in original). The parties may agree to arbitrate arbitrability. *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986). And, when the parties so agree, "they delegate to an arbitrator all threshold questions concerning arbitrability," including "whether the parties are bound by a given arbitration clause." *Belnap v. Iasis Healthcare,* 844 F.3d 1272, 1280 (10th Cir. 2017) (citing in part *BG Grp. PLC v.*

*Republic of Arg.*, --- U.S. ----, 134 S.Ct. 1198, 1206, 188 L.Ed.2d 220 (2014)) (additional citations omitted).

"[Q]uestions of arbitrability encompass two types of disputes: (1) disputes about '*whether* a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement,"… and (2) 'threshold disputes about *who should have the primary power to decide*' whether a dispute is arbitrable." *Belnap*, 844 F.3d at 1280 (quoting *First Options*, 514 U.S. at 944-45, 942) (emphasis in original). When addressing the second type of dispute, i.e., whether parties have agreed that arbitrators rather than the court should decide arbitrability, courts "should not assume the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *Id.* (quoting *First Options*, 514 U.S. at 944) (additional citations omitted).

Here, it is undisputed that the Parties agreed to an arbitration to be governed by the AAA Rules. In turn, the Rules reserve for the AAA arbitrators the question of arbitrability, *Construction Industry Arbitration Rules and Mediation Procedures* at R-9, *supra*, and the Agreement expressly states that the Rules shall govern any disputes arising therefrom. *See* [#1-2]. Thus, the court has before it clear and unmistakable evidence that the Parties agreed that the arbitrator should resolve questions of arbitrability. *See Belnap,* 844 F.3d at 1279, 1281-82 (reviewing a similar rule of the Judicial Arbitration and Mediation Service ("JAMS") and concluding, within the context of a motion to compel arbitration, that "by incorporating the JAMS Rules into the Agreement, Dr. Belnap and SLRMC evidenced a clear and unmistakable intent to delegate questions of arbitrability to an arbitrator") *See also id.* at 1283 (citing "in an analogous context," sister circuits that have addressed the issue and "unanimously concluded that incorporation of the substantively identical (as relevant here) AAA Rules constitutes clear and

unmistakable evidence of an agreement to arbitrate arbitrability."). Upon such a finding of clear and unmistakable evidence, the court "must allow an arbitrator to decide issues of arbitrability in the first instance"; there is no provision for the use of discretion. *See id.* at 1292-93.

In considering that arbitration is a matter of contract, courts generally apply "ordinary state-law principles that govern the formation of contracts." *First Options*, 514 U.S. at 944. *Accord Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630–31 (2009) (holding that the issue of whether a nonsignatory can be bound by or compel arbitration under an arbitration agreement is governed by state law). "Under Colorado law, both signatory and nonsignatory parties may be bound by an arbitration agreement if so dictated by ordinary principles of contract law." *Meister v. Stout*, 353 P.3d 916, 920 (Colo. App. 2015) (citing *Smith v. Multi–Financial Sec. Corp.,* 171 P.3d 1267, 1272 (Colo. App. 2007) (further citation omitted)). In this state, "the association of two or more persons to carry on as co-owners a business for profit forms a partnership, whether or not the persons intend to form a partnership." Colo. Rev. Stat. § 7–64–202(1). Colorado law has also defined a partnership as "an express or implied contract between two or more persons to place their money, skill, effects or labor into a business, and to share the profit and losses." *In re Palilla*, 493 B.R. 248, (Bankr. D. Colo. 2013) (quoting *Larsen v. Consolidated Pet Foods, Inc. (In re S & D Foods, Inc.),* 144 B.R. 121, 158 (Bankr. D. Colo. 1992)). No written agreement is required; the partnership may be formed by the conduct of the parties. *Id. Accord Stratman v. Dietrich*, 765 P.2d 603, 605 (Colo. App. 1988). The Colorado Uniform Partnership Act provides that all partners in a general partnership are liable jointly and severally for all partnership obligations unless otherwise agreed or provided by law. Colo. Rev. Stat. § 7-64-306(1).

In the arbitration, the Fitzes asserted that Midshore, Janus Arch, Gidding & Spencer, and FYG "were mere shells and that Gidding and Spencer were actually doing business as partners in

a general partnership," and, alternatively, that if those entities "were real companies, the Fitzes were entitled to pierce the corporate veil and hold Gidding and Spencer individually liable." [#20 at 18]; *see* [#24 at ¶ 12; #24-10]. The arbitrator concluded that Mr. Gidding and Ms. Spencer were operating as a general partnership called Gidding & Spencer and that Mr. Gidding was accordingly bound by the arbitration provision in the Revised Services Agreement, which superseded the Agreement, and was liable for breach of contract, among other claims. [#20 at 18]; *see* [#24-2; #24-16]. Courts are to "give 'extreme deference' to the determination of the arbitrator, as the standard of review of arbitral awards is amongst the narrowest." *THI of New Mexico at Vida Encantada, LLC v. Lovato*, 864 F.3d 1080, 1083 (10th Cir. 2017) (quoting *Brown v. Coleman Co.*, 220 F.3d 1180, 1182 (10th Cir. 2000)). Even if this court were convinced that the arbitrator committed serious error (and it is not), the conclusion would not serve as a proper ground to vacate the arbitration award. *Id.*

This court finds that the arbitrator acted within his authority, and thus turns to Mr. Gidding's allegations of fraud and arguments regarding manifest disregard of the law.

## 2. Allegations of Fraud

I begin with the various contracts entered into by the Parties. The Agreement was between Mr. Fitz and Janus Arch as a d/b/a Midshore, and was signed by Ms. Spencer as "CEO" of Janus Arch. *See* [#1-2]. The logo on the Agreement reads, "Janus Arch/John Gidding." *Id.* The arbitrator found, following the evidentiary hearing, that "[a]round March 11, 2014, Gidding & Spencer assumed responsibility for Midshore's obligations under [the Agreement] via a proffered revised services agreement (the 'Revised Services Agreement'…)." [#21-1 at 4]. The Revised Services Agreement included a signature block for Gidding & Spencer and provided for Ms. Spencer's signature as "Partner"; the cover email for the Revised Services Agreement

referred to Ms. Spencer as "Senior Partner" of Gidding & Spencer. [*Id.*] The arbitrator noted that Mr. Fitz testified at the evidentiary hearing that while neither he nor Mrs. Fitz signed the Revised Services Agreement, "they considered it to be in effect at the time it was received," and the arbitrator found as a matter of law that "the Fitzes and Gidding & Spencer treated the proffered form that Ms. Spencer signed as the parties' agreement." [*Id.* at 5, n.2]. *See also* [#1-17 at 32-41]. The arbitrator then discussed the history of the professional relationship between Mr. Gidding and Ms. Spencer and the Fitzes as follows:

> The [Agreement] granted the Fitzes the authority to terminate the design services of Midshore/Janus Arch after initial design was completed. They chose not to do so and opted to continue with Mr. Gidding's and Ms. Spencer's design services for the second and third phases of the Project. At that time, Mr. Gidding and Ms. Spencer opted to change the entity with whom the Fitzes were contracting from Midshore/Janus Arch to Gidding & Spencer. [citation omitted]. This change was not unexpected by the Fitzes because Ms. Spencer had previously advised them that she and Mr. Gidding were setting up their own design firm, and the Fitzes were agreeable to the change. This change was also logical given the personal nature of architectural and design services and because Mr. Gidding and Ms. Spencer were the only Midshore/Gidding & Spencer principals they ever dealt with… Ms. Spencer later confirmed that Gidding & Spencer was a general partnership when she executed a mechanic's lien disburser's notice in her capacity as partner of Gidding & Spencer. [citation omitted].

[*Id.* at 6-7]. The arbitrator then found that "the commonality of the persons involved (Mr. Gidding and Ms. Spencer) and the manner that the agreements were entered into and performed establishes that the corporate entities were a sham and support a piercing of the corporate veil of Midshore." [*Id.* at 7]. Finally, the arbitrator concluded that "since Mr. Gidding performed professional services under both agreements, he is properly subject to the arbitration provision in the two agreements and is individually liable to the Fitzes for his failure to provide services that meet the standard of care of an architect." [*Id.*]

In the Petition, Mr. Gidding asserts that the Revised Services Agreement "misrepresents 'Gidding & Spencer' as a professional partnership and as Fitzes' architect of record." [#1 at 4, ¶

15].  Mr. Gidding further asserts that the Final Award is the product of fraud because Richard Hill, serving as counsel to the Fitzes, "hatched" a "scheme of creating a partnership named 'Gidding & Spencer' (with added spaces)…which misrepresented Gidding & Spencer as a professional partnership of architects."  [*Id.* at 17, ¶ 64].  Mr. Gidding contends that Mr. Hill "pressured [Ms. Spencer] into signing documents that misrepresented her as an architect and as a partner in a professional partnership."  [*Id.*]  For support, Mr. Gidding cites the declaration of Ms. Spencer, in which she attests that the Revised Services Agreement, which she and Mr. Gidding refer to as the "AIA-Contract," "misrepresents the fanciful name of Gidding&Spencer (without spaces) as Gidding & Spencer (with spaces) making it appear to be a professional partnership of architects."  [#1-17 at 4, ¶ 14].  Ms. Spencer further attests, "I am not in a partnership with any member of the Gidding family, nor am I an architect."  [*Id.*]  Ms. Spencer echoes Mr. Gidding's assertion that Mr. Hill, serving as counsel to the Fitzes, asked her "to sign documents misrepresenting myself as an architect and a partner in a partnership"; and that when she told Mr. Hill that she and Mr. Gidding were not architects and were not partners and refused to sign these documents, Mr. Hill "threatened me with non-payment unless I signed the documents," and she signed documents misrepresenting herself out of intimidation.  [#1-17 at 4, ¶ 15].

Plaintiff's assertions of fraud simply are not supported by the evidence of record, including the exhibits to which Ms. Spencer cites in her Declaration.  [#1-17 at 6-93].  There is no correspondence from Ms. Spencer suggesting that she balked at signing the documents at any time.  *See* [*id*.]  There is also no correspondence, either between Mr. Hill and Ms. Spencer, or between Ms. Spencer and anyone else, to suggest that Mr. Hill pressured her into signing any documents.  [*Id.*]  And, it does not strike this court as persuasive that the placement of spaces

between "Gidding&Spencer" promotes the appearance of an entity of professional architects more so than without the spaces. Nor is the court swayed by the suggestion that Mr. Hill or his associates nefariously inserted spaces to somehow mislead a yet-to-be identified arbitrator for an arbitration that was ultimately initiated by Midshore, not the Fitzes. Indeed, it appears that individuals associated with Gidding & Spencer also used spaces between the last names to identify their company affiliation. *See* [#25-1 at 1]. Ms. Spencer's subjective feelings of intimidation do not establish fraud on the part of Mr. Hill, and other than Ms. Spencer's affidavit, Mr. Gidding introduces no evidence to support his allegations that Mr. Hill somehow defrauded the arbitrator into making a determination adverse to his interests. [7] *See Garret v. Hewlett–Packard Co.,* 305 F.3d 1210, 1213 (10th Cir. 2002) ("We do not consider 'conclusory and self-serving affidavits'") (quoting *Murray v. City of Sapulpa,* 45 F.3d 1417, 1422 (10th Cir. 1995)). However, even if he had, Mr. Gidding fails to address how his exercise of due diligence could not have resulted in discovery of the fraud prior to arbitration.

### 3. Manifest Disregard of the Law

It also does not appear that the arbitrator manifestly disregarded the law. The Tenth Circuit has interpreted "manifest disregard of the law" to mean "willful inattentiveness to the governing law." *Bowen v. Amoco Pipeline Co.*, 254 F.3d 925, 932 (10th Cir. 2001). Based on the record before him, the arbitrator determined that Spencer & Gidding held itself out, through Ms. Spencer, as a General Partnership and that Mr. Gidding was appropriately joined to the arbitration in his partner capacity. *See* [#1-17 at 62, 74-75, 76, 77]. *See also* [#1-17 at 81]. At the core, Mr. Gidding takes issue with how the arbitrator interpreted the facts presented and applied the law. But the court's power to vacate an arbitrator award is limited, and the FAA does

---

[7] Mr. Hill and Mr. Fitz, for their part, vigorously dispute Ms. Spencer's account of the discussions between the three. *See* [#23, #25].

not authorize the court to engage in a general review of an arbitration proceeding to look for an arbitrator's legal errors. *See Hall Street Assoc., LLC v. Mattel, Inc.*, 552 U.S. 576, 584 (2008). Rather, to establish "manifest disregard of the law," Mr. Gidding would need to demonstrate that the arbitrator knew of the law and explicitly disregarded it. *Bowen*, 254 F.3d at 932. Mr. Gidding points to neither applicable law that the arbitrator disregarded, nor evidence that the arbitrator engaged in misconduct. Nor does he point to evidence that the arbitrator somehow precluded him from participating in the arbitration; Mr. Gidding voluntarily declined to participate. There simply is no evidence that the arbitrator knew the law and willfully misapplied it. And it is not this court's role to re-adjudicate the facts presented to the arbitrator. *Id.* at 935. I find that the record does not support Mr. Gidding's contentions of fraud or manifest disregard of the law, and certainly does not provide clear and convincing evidence of such. And the fact that Mr. Gidding disagrees with the arbitrator's conclusion, even if it were flawed, is also not a ground to vacate the arbitration award.

Accordingly, because the record does not support a finding that the arbitrator manifestly disregarded the law, or a finding of fraud under § 10(a)(1), I recommend the court deny the request to vacate on these bases. I turn next to Mr. Gidding's argument regarding insufficient service of process.

### B. Notice of the Arbitration

Mr. Gidding asserts the Final Award should be vacated due to insufficient service, and represents that he was never served with the demand to arbitrate, Mr. Fitz's motion to join, the Fitzes' amended counterclaims, the arbitrator's Interim Award, or the Final Award. [#1; #1-15]. It is not clear to this court which of the § 10 grounds Mr. Gidding wishes to invoke with this argument, but, to the extent the argument is cognizable under that section, this court respectfully

rejects it.  As the Fitzes assert, the Rules do not require personal service that comports with the Federal Rules of Civil Procedure.  *See* [#47 at 9]; *Construction Industry Arbitration Rules and Mediation Procedures* at R-4, *supra*.

It appears from the record that the Fitzes served, by certified mail, copies of their demand for arbitration and answer and counterclaims in the arbitration to Ms. Spencer's address in Atlanta, Georgia, which is the address that was listed on the Agreement and Revised Services Agreement, and Ms. Spencer received and signed for the documents.  *See* [#24 at 2, ¶ 9; #24-7 at 1].  On the same date that copies of these documents were sent by certified mail, duplicate copies were sent by Federal Express to the same address and were delivered on June 26, 2015.  *See* [#24-8].  The package was addressed to "Midshore/Krystee Spencer/Can Danny Gidding/Krystee Manifold/Janus Arch."  [#24-7 at 1].  The arbitration demand listed the following as respondent: "Midshore, Gidding, Spencer, JanusArch," and identified John R. Gidding as the representative. [*Id.* at 2].  Pending return of the receipt for the first copy of documents sent via certified mail, counsel for Mr. Fitz sent a third copy of the documents by certified mail to the same Atlanta address.  Ms. Spencer signed for those documents on July 3, 2015.  *See* [#24-9].  On July 7, 2015, Mr. Fitz moved to join the following parties as additional Counter-Respondents: "Can D. Gidding a/k/a Can Danny Gidding a/k/a John Gidding; Krystee Manifold a/k/a Krystee Manifold Spencer a/k/a Krystee Spencer; Janus Arch; and Gidding & Spencer."  The certificate of service attached to the motion to join indicates that each party was provided a copy at their respective email addresses.  *See* [#24-10].

As an initial matter, the record shows that the Fitzes complied with the Rules.  As a secondary matter, the court notes that any confusion on the Fitzes' part concerning the precise entities and individuals to whom to give notice is frankly of Mr. Gidding, Ms. Spencer, and John

R. Gidding's own doing. The record demonstrates that John R. Gidding, who is not an attorney, initiated the arbitration on behalf of Midshore, *see* [#1-16 at 3, ¶¶ 11, 12]; and he continued to represent Midshore until ordered by the arbitrator to retain outside counsel, [#1-16 at 5, ¶ 22],[8] whom he instructed "to make a special appearance on behalf of [Mr. Gidding], object to the AAA-Tribunal's jurisdiction over [Mr. Gidding], and then withdraw as [Mr. Gidding's] counsel." [*Id.* at ¶ 23]. Indeed, it is clear that Mr. Hill and Mr. Morris believed that John R. Gidding represented his son, Mr. Gidding. *See* [#1-16 at 4, ¶¶ 17, 29; #24-9 at 1]. These matters aside, Mr. Gidding was indisputably aware of the arbitration proceedings, *see, e.g.,* [#1 at 6-7, ¶¶ 27, 31; #1-15 at ¶¶ 12, 13, 15; #1-16 at 5, ¶¶ 22, 23], and the record shows that Mr. Gidding objected to being joined to the arbitration proceeding and generally declined to participate, choosing instead to challenge the arbitration in district court.

Finally, and in addition to the fact the record reflects that the Fitzes complied with the Rules, the arguments advanced by Mr. Gidding with respect to personal service do not articulate fraud as contemplated by § 10(a) of the FAA. *See Bapu Corp. v. Choice Hotels International, Inc.*, 371 F. App'x 306, 310-11 (3d Cir. 2010) (affirming that franchisor was not entitled to vacatur of arbitration award based on franchisee's erroneous service of demand on wrong entity). As in *Bapu Corp.*, there is no evidence suggesting that the Fitzes fraudulently served the wrong Mr. Gidding, or failed to serve him in an effort to defraud the court, and Mr. Gidding undeniably had notice of and an opportunity to participate in the arbitration. *See id.* (citing *Bonar v. Dean Witter Reynolds, Inc.,* 835 F.2d 1378, 1383 (11th Cir. 1988) (articulating the following test to determine whether an arbitration award should be vacated for fraud: the movant must establish

---

[8] The Rule 7 arbitrator explained that "[u]nder Colorado law, closely held business entities may be represented in matters such as arbitrations by an individual who is officer, director or member. Pursuant to the statements of John Roger Gidding he is not and therefore MidShore Marketing Inc. must be represented by counsel." [#24-16 at 3].

(1) by clear and convincing evidence, (2) fraud that was not discoverable through the exercise of due diligence prior to or during the arbitration, and (3) was materially related to an issue in the arbitration)).

As to Mr. Gidding's remaining arguments regarding procedural due process and the doctrine of unclean hands, these are not bases under the FAA for vacating the Final Award. *See Bowen*, 254 F.3d at 932 ("Mindful of the strong federal policy favoring arbitration, a court may grant a motion to vacate an arbitration award only in the limited circumstances provided in § 10 of the FAA…or in accordance with a few judicially created exceptions"); *Denver & Rio Grande Western Railroad*, 119 F.3d at 849 (listing examples of "a handful of judicially created reasons"). *Cf. Dominion Video Satellite, Inc. v. Echostar Satellite L.L.C.*, 430 F.3d 1269, 1275, 1278 (10th Cir. 2005) (rejecting six arguments that arbitration award should be set aside, including on the grounds of preemption, violation of the First Amendment of the Constitution, claim preclusion, doctrine of legal impossibility, and justiciability, as none "are grounds for vacating the arbitration award," and finding the appeal of the award to be frivolous). Even were the court inclined to consider equitable remedies, the record does not support Mr. Gidding's argument that "it would be in the interest of justice for this court to dismiss the Fitzes claims with prejudice [sic] and remand the case for entry of judgment in Midshore's favor." [#1 at 19]. Accordingly, finding no basis for vacating the award, I respectfully recommend that the Motion to Confirm be GRANTED, consistent with the mandate of 9 U.S.C. § 9.

## III.   Additional Relief

Finally, with respect to the requested prejudgment interest, the Fitzes cite the Interim Award that grants them $670,192 in damages and prejudgment interest per annum under Colo. Rev. Stat. § 5-12-102(b). The Final Award ultimately granted the Fitzes $72,234.75 in

prejudgment interest on $586,321 in damages. The Fitzes seek additional prejudgment interest in the amount of $146.89 per day, calculated on the principal amount of damages under the Interim Award or, alternatively, interest in the amount of $128.51 per day, calculated on the principal amount of damages under the Final Award. [#21 at 6].

State law applies when determining the issue of prejudgment interest. *Hicks v. Cadle Co.*, 355 F. App'x 186, 199 (10th Cir. 2009) (remanding matter to district court to enter award of prejudgment interest). "[T]he purpose of prejudgment interest is to reimburse the plaintiff for inflation and lost return." *Goodyear Tire & Rubber Co. v. Holmes,* 193 P.3d 821, 826 (Colo. 2008) (citing *Mesa Sand & Gravel Co. v. Landfill, Inc.,* 776 P.2d 362, 364 (Colo. 1989) ("Section 5–12–102 recognizes the time value of money."). Section 5-12-102, C.R.S. serves as Colorado's "general prejudgment and postjudgment statute," *Farmers Reservoir and Irr. Co. v. City of Golden,* 113 P.3d 119, 133 (Colo. 2005), and provides for the payment of interest at the rate of eight percent per annum compounded annually. Colo. Rev. Stat. § 5-12-102(1).

"[T]he determination of whether prejudgment interest should be added to an award of damages in an arbitration is for the arbiters to decide." *Levy v. American Family Mut. Ins. Co.*, 293 P.3d 40, 50 (Colo. App. 2011). *Cf. Duncan v. Nat'l Home Ins. Co.*, 36 P.3d 191, 192–93 (Colo. App. 2001) (holding the addition of prejudgment interest upon confirmation of the arbitration award was an impermissible modification of the award when plaintiff did not request prejudgment interest during the arbitration proceedings but only when confirming the arbitration award). There is no dispute that the matter of prejudgment interest was before the arbitrator and the arbitrator included prejudgment interest in the sum of damages awarded to the Fitzes. Furthermore, the Fitzes have not received payment of the award. *See Columbine Valley*

*Construction Co. v. Board of Directors, Roaring Fork School Dist. RE-1J*, 626 P.2d 686, 694-95 (Colo. 1981) (en banc) (affirming application of § 5-12-102 to allow interest on arbitration award from the date of the award).

Thus, the question presented here is what amount of prejudgment interest since the date of the Final Award should the Fitzes receive. The Fitzes suggest first that the court confirm as prejudgment interest an amount that corresponds to the principal amount of damages specified in the Interim Award, issued on March 2, 2017; they propose in the alternative that the court confirm as prejudgment interest an amount that corresponds to the smaller, principal amount of damages specified in the Final Award, issued March 22, 2017. *Compare* [#21-1] *with* [#21-2]. The Fitzes provide no explanation, and I can discern none, as to why the court should apply the principal amount of damages specified in the Interim Award as opposed to the Final Award, when the Final Award is clearly the final order of the arbitration proceedings. Furthermore, the arbitrator states in the Final Award that "prejudgment interest should be based on $586,321, which is the difference between the total award of $670,192 and the Architectural Wood award of $83,871," for a total annual compounded interest award of $72,234.75. [#21-2 at 4]. Accordingly, I find that the court should award prejudgment interest at the rate of eight percent calculated on $586,321, from March 23, 2017, the day after entry of the Final Award, through the date of entry of judgment in this matter.

The Fitzes also request attorney fees and costs pursuant to Colo. Rev. Stat. § 13-22-225, which provides in pertinent part:

> On the application of a prevailing party to a contested judicial proceeding under section 13-22-222, 13-22-223, or 13-22-224, the court may add reasonable attorney fees and other reasonable expenses of litigation incurred in a judicial proceeding after the award is made to a judgment confirming, vacating without directing a rehearing, modifying, or correcting an award.

Sections 13-22-222, 13-22-223, and 13-22-224 refer to proceedings in Colorado state court to confirm, vacate or modify an arbitral award, and the FAA does not provide for the award of attorneys' fees and reasonable litigation expenses to the prevailing party. This court found no instance in which a federal court applied § 13-22-225 to award a prevailing party its attorneys' fees and reasonable litigation expenses. Based on the authority before me, I have concluded that the CRUAA does not apply to the Agreement, and the Fitzes cite no authority that permits the court to award them attorneys' fees under the CRUAA in a proceeding governed by the FAA. Nor do the Fitzes cite alternative authority under which the court may award attorneys' fees and costs, and this court found none. I thus respectfully recommend that the court deny this relief.

## CONCLUSION

For the foregoing reasons, I respectfully **RECOMMEND** that:

1. The Motion of Respondents and Counter-Movants Timothy Fitz and Kelly Fitz to Confirm Arbitration Award [#21] be **GRANTED IN PART and DENIED IN PART**; and

2. The Motion be **GRANTED** in that the final award of $819,926.66 be **CONFIRMED** in favor of Timothy Fitz and Kelly Fitz, with the provision that post-award, prejudgment interest from March 23, 2017 through the date of entry of judgment in this matter be added at a rate compounded annually based on $586,321, and the Motion be **DENIED** as to attorney fees and costs in addition to the amount already awarded and provided for in the final award. [9]

---

[9] Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the District Court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and

DATED: January 19, 2018                    BY THE COURT:


                                           s/Nina Y. Wang_____
                                           United States Magistrate Judge

---

recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Property Known As 2121 East 30th Street, Tulsa, Oklahoma*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the District Judge of the Magistrate Judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (District Court's decision to review a Magistrate Judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *International Surplus Lines Insurance Co. v. Wyoming Coal Refining Systems, Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the Magistrate Judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the Magistrate Judge's ruling). *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).